Robert L. Rosenthal, Esq.
California Bar No. 173047
Mark J. Gardberg, Esq.
California Bar No. 187796
HOWARD & HOWARD ATTORNEYS PLLC
9465 Wilshire Blvd. Ste 300
Beverly Hills, CA 90212
Telephone: (424) 303-7700
Email: rlr@h2law.com; mjg@h2law.com

*Attorneys for Plaintiff Gilda Versales*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| GILDA VERSALES, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>AI Coin, Inc., a Delaware Corporation; DOES 1 – 10, inclusive; ROE CORPORATIONS 1 – 10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

Plaintiff Gilda Versales ("Ms. Versales" or "Plaintiff"), by and through her counsel, Howard & Howard Attorneys PLLC, complains and alleges against AI Coin, Inc. ("AIC" or "Defendant") as follows:

## **PARTIES**

1. Plaintiff, Ms. Versales is, and at all relevant times was, a resident of California.

2. Upon information and belief, Defendant is, and at all relevant times was, a Delaware Corporation with its principal place of business in New Jersey.

3. Defendants sued herein under the fictitious names of DOES 1 through 10, inclusive, are presently unknown to Plaintiff but one or more may be in some respect liable for the acts and

omissions, whether intentional, negligent, or otherwise, alleged herein.

4. Defendants sued herein under the fictitious names of ROE CORPORATIONS 1 through 10, inclusive, are presently unknown to Plaintiff but may be in some respect liable for the acts and omissions, whether intentional, negligent, or otherwise, alleged herein.

## JURISDICTION AND VENUE

5. Jurisdiction is proper under 28 U.S.C. §1332(a), because there is complete diversity of citizenship between the parties and the amount in controversy in this action exceeds $75,000, exclusive of costs and interest.

6. This Court has personal jurisdiction over Defendant based on Defendant's intentional acts aimed at the State of California (namely, its offering of an investment opportunity to Ms. Versales), with the knowledge that Ms. Versales resides in California.

7. The Northern District of California is a proper venue for the adjudication of this dispute pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, or a substantial part of property that is the subject of the action, is situated in Alameda County, California.

## GENERAL ALLEGATIONS

8. In late 2018 or early 2019, Ms. Versales' church leader in Northern California (the "Church Leader") introduced her to an individual named Drew Hingorani ("Mr. Hingorani").

9. In late 2018 or early 2019, The Church Leader told Ms. Versales that Mr. Hingorani was asking people to invest in AIC.

10. In late 2018 or early 2019, Mr. Hingorani was the Chief Executive Officer ("CEO") of AIC.

11. Upon information and belief, Mr. Hingorani is currently the CEO of AIC.

12. Although Mr. Hingorani is not currently a named party, Plaintiff reserves the right to amend the subject complaint to include Mr. Hingorani as a Defendant due to the fact that he committed fraud, breached his fiduciary duties, embezzled funds, and committed other acts of malfeasance.

13. Upon information and belief, the Church Leader received kickbacks from Mr.

Hingorani for successfully bringing investors to AIC.

14. Upon information and belief, at no time did the Church Leader, Mr. Hingorani, or anyone from AIC deliver to Ms. Versales a "private placement memorandum" or similar document notifying Ms. Versales of the risk factors related to investing in AIC.

15. On or about January 21, 2020, following several sales pitches and meetings, Ms. Versales entered into an agreement with AIC wherein Ms. Versales invested $150,000 into AIC in exchange for 120 shares of AIC's common stock, with each share costing Ms. Versales $1,250 (the "First Stock Purchase").

16. At or around the time that Ms. Versales made the First Stock Purchase, AIC represented to Ms. Versales that Mr. Hingorani was one of the largest shareholders of AIC.

17. Several months after the First Stock Purchase, Mr. Hingorani approached Ms. Versales with a "special opportunity" to obtain another 1,000 shares of AIC's common stock for $100,000, with each share costing $100.

18. On or about July 10, 2020, Ms. Versales purchased another 1,000 shares of AIC's common stock for $100,000 (the "Second Stock Purchase").

19. As a result of those two purchases, as of July 10, 2020, Ms. Versales owned 1,120 shares and had invested in AIC a total of $250,000.

20. Over the following two and a half years, Ms. Versales received almost no information about her investments in AIC, including but not limited to, AIC's financial performance and AIC's blockchain product developments.

21. At no time did Ms. Versales receive any notice of any Annual or Special Meetings of AIC's stockholders, despite the fact that (i) Section 2 of AIC's Bylaws obligated AIC to notify all stockholders of an annual meeting of the stockholders for the election of directors and the transaction of such other business as may properly come before the meeting, and to hold such a meeting each year; and (ii) Delaware corporate law requires the same (Del. Corp. C. § 211).

22. In or around January 2022, Mr. Hingorani owned 25,500 of 63,406 (i.e., 40.2%) total shares in AIC.

23. As time passed, Ms. Versales repeatedly expressed her concerns to AIC regarding the legitimacy of the company and questioned Mr. Hingorani's performance and whether he was acting in the best interests of AIC.

24. In response to Ms. Versales' multiple concerns, Mr. Hingorani, acting on behalf of AIC, repeatedly told Ms. Versales that AIC was on the verge of securing large investors to purchase the company, which would result in AIC's shareholders making a huge profit.

25. In or around 2021 or 2022, Mr. Hingorani told Ms. Versales that AIC was valued at one billion dollars.

26. Mr. Hingorani often told Ms. Versales about a pending deal involving an Arkansas investor and that the deal would be executed in a matter of days or weeks.

27. After months of hearing about imminent deals that never came to fruition, Ms. Versales reached a breaking point. Given the total lack of detailed information and documentation provided to Ms. Versales since she made the First Stock Purchase, from March 27, 2023 to May 8, 2023, Ms. Versales, through her attorney, sent Mr. Hingorani several emails exercising her stockholder inspection rights under Del. Corp. C. § 220.

28. Del. Corp. C. § 220 entitles a stockholder in a Delaware corporation to, among other things, inspect the "corporation's stock ledger, a list of its stockholders, and its other books and records."

29. From March 27, 2023 to May 8, 2023, pursuant to Del. Corp. C. § 220, Ms. Versales demanded that AIC provide her with copies of the following documents: (a) AIC's stock ledger; (b) a list of AIC's stockholders; (c) a copy of AIC's Articles of Incorporation and Bylaws with any amendments; (d) AIC's 2021 annual financial documents including its end-of-year balance sheet, income statement, statement of cash flows, and federal tax returns (collectively, the "Financial Documents"); (e) AIC's 2022 Financial Documents; (f) AIC's 2023 Financial Documents; and (g) the current Letter of Intent between AIC and the Arkansas investor referenced in paragraph 26 herein.

30. AIC failed to properly and timely comply with Ms. Versales' demand for the documents referenced in paragraph 29 herein.

31. AIC blamed its untimeliness on, among other things, (a) a computer hack for which no evidence was provided to Ms. Versales; and (b) Mr. Hingorani's "busyness" in dealing with two lawsuits.

32. Mr. Hingorani initially told Ms. Versales that he could not provide her with a list of AIC's stockholders because that information was confidential, notwithstanding Delaware law to the contrary.

33. Mr. Hingorani understood that disclosing AIC's almost non-existent financials, lack of corporate paperwork, and other responsive documents would reveal that AIC was virtually worthless, a chaotic mess, and perhaps a Ponzi scheme.

34. On June 5, 2023, Ms. Versales, through her attorney, once again demanded that AIC comply with Del. Corp. C. § 220 and produce all of the documents listed in paragraph 29 herein within the statute's five-day deadline.

35. AIC failed to produce the documents within the five-day statutory deadline.

36. Several months later Ms. Versales threatened to sue AIC. This resulted in AIC providing her with only some of the requested documents, such as AIC's 2021 tax return.

37. The limited document production confirmed that AIC was worth little to nothing and that upon information and belief, the Arkansas investor did not exist.

38. AIC's 2021 tax return revealed that the company had (a) just $25,023 in annual gross revenues; (b) a total annual net loss of $24,027; and (iii) a significant operating loss carryover from prior years.

39. Among the scant documents produced by AIC was a four-page purported "Asset Purchase Agreement," which was over one year old, was unsigned, had no purchase price, and was absurdly unsophisticated with respect to its provisions.

40. "BFO-Technology Fund, LLC, an Arkansas limited liability company" was listed as the other party to the Asset Purchase Agreement; however, no such entity currently exists.

41. AIC intentionally delayed producing the requested documents to Ms. Versales in order to give itself time to manufacture the documents and information.

42. Ms. Versales' review of the documents produced by AIC uncovered numerous additional examples of AIC's failure to comply with its legal obligations, including but not limited to, AIC's lack of annual Board of Director elections, AIC's failure to notify stockholders of its annual meetings, and AIC holding Board of Directors and/or Stockholder meetings without a quorum.

43. After Ms. Versales reviewed AIC's incomplete and legally non-compliant document production, she submitted another demand to AIC that sought (a) the Notice of Annual Meetings that under Delaware law should have been sent to her in advance of AIC's 2020, 2021, and 2022 annual meetings; and (b) clarification as to why the presence of only four members of AIC's Board of Directors at several annual meetings of stockholders constituted a quorum.

44. AIC did not timely respond to Ms. Versales' demand. Accordingly, On September 8, 2023, Ms. Versales sent a repeated demand letter.

45. Shortly after Ms. Versales sent her September 8, 2023 demand letter, AIC offered Ms. Versales a stock redemption, whereby AIC would repurchase Ms. Versales' common stock. AIC and Ms. Versales then began discussing the terms of such a deal. Those discussions were successful and the parties agreed on final terms.

46. On or about November 22, 2023, Ms. Versales and AIC entered into a Redemption Agreement ("Redemption Agreement").

47. Under the terms of the Redemption Agreement, Ms. Versales agreed to deliver her common stock and/or physical share certificates (or a lost note affidavit), and AIC agreed to pay Ms. Versales a minimum of $285,000.

48. AIC's payment of $285,000 to Ms. Versales was to be paid in the following manner: (a) payment of $150,000, to be made no later than January 8, 2024; and (b) payment of $135,000 plus Plaintiff's attorneys' fees, to be made no later than February 5, 2024.

49. The Redemption Agreement contemplated a potential third payment to Ms. Versales if AIC was sold to a third party.

50. At the time AIC entered into the Redemption Agreement, AIC knew or should have known that it was either incapable of, or had no intention of, paying Ms. Versales $285,000.

51. On January 8, 2024, AIC's attorney informed counsel for Ms. Versales that the first payment of $150,000 was not going to be timely paid due to the death of someone close to Mr. Hingorani. AIC did not specify when payment would be made.

52. Ms. Versales expressly refused to grant AIC a forbearance of its obligation to timely pay Ms. Versales all monies due under the Redemption Agreement, and AIC did not request one.

53. On February 5, 2024, AIC failed to pay Ms. Versales $135,000 plus attorneys' fees due under the Redemption Agreement.

54. On February 5, 2024, AIC had still not paid Ms. Versales the first payment of $150,000 due pursuant to the Redemption Agreement.

55. Under Section 2.02(d) of the Redemption Agreement, each of the two installment payments began to bear default interest from its due date "at a rate of fifteen percent (15%) per annum, compounded monthly."

56. Between February 5, 2024 and the date of the subject Complaint, AIC has not paid Ms. Versales any of the monies due under the Redemption Agreement, except as noted in Paragraph 61 below.

57. Between February 5, 2024 and the date of the subject Complaint, AIC has continued to tell Ms. Versales stories about imminent investment deals, incoming capital, and loans to try to appease Ms. Versales.

58. Between February 5, 2024 and the date of the subject Complaint, AIC, through its counsel, sent emails to Ms. Versales' attorney with entirely fictional, continually broken promises regarding when payments under the Redemption Agreement would be made.

59. To buttress its illusory promises, AIC even produced a purported:

(a) "Stock Purchase Agreement" dated January 30, 2024, between AIC and two different investors, which together would have brought $360,000 into the company; but not surprisingly, this too was a lie; and

(b) a three-page "Statement of Work" and three "Invoices," supposedly issued by AIC to a Florida company named O'Neill Marketing, and supposedly contemplating a $1,600,000

payment due from that Florida company.

60. Mr. Hingorani repeatedly lied to Ms. Versales about investors and when Ms. Versales would be paid.

61. For example, on May 1, 2024, Mr. Hingorani advised Ms. Versales' counsel that, "I have confirmation from both the factoring company and 1 investor for $350K; my goal is to send Ms. Versales $350K by next week and explain that we are also in the process of trying to sell one of our patents for an exit event so she can benefit which is why we are so determined to finalize the funds for her and move forward with the sale of a patent so she benefits twice. We are as frustrated as they are but we have been able to confirm from two sources that funds will be available soon and there is still a chance the factoring company can possibly send funds this Friday. We are positive the funds from one of the sources will arrive next week and would like to stay in touch with them daily to keep them updated on progress. We are not working on anything else but making sure these funds arrive shortly and hope to have good news for them very soon."

62. Finally, after more than one year of AIC's broken promises (and months after the payment deadlines in the Redemption Agreement), and despite promising payment in full just hours before the remittance, on May 7, 2024, AIC made a partial payment of $100,000 to Ms. Versales.

63. As of the date of the subject Complaint, AIC still owes Ms. Versales over $200,000.

64. AIC continues to promise Ms. Versales that it will pay her all monies due and owing, but it continues to break its promises, including a promised payoff on July 1, 2024.

65. Pursuant to Section 2.02(d) of the Redemption Agreement, Ms. Versales is entitled to contractual default interest in the amount of 15% per annum, compounded monthly.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

66. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

67. Plaintiff and Defendant are parties to the Redemption Agreement, which was executed on November 22, 2023, which constitutes a valid, binding, and enforceable contract.

68. Plaintiff has fulfilled all of her obligations under the Redemption Agreement.

69. By engaging in the actions and inactions complained of herein, Defendant has breached the Redemption Agreement.

70. As a direct and proximate result of Defendant's breach of the Redemption Agreement, Plaintiff has been and will be damaged in an amount in excess of $75,000.

71. As a direct and proximate result of Defendant's breach of the Redemption Agreement, Plaintiff has been required to retain the services of an attorney to prosecute this action and is therefore entitled to recover attorneys' fees and costs thereof as damages and/or pursuant to the terms and conditions of the Redemption Agreement.

## SECOND CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing

72. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

73. Every contract carries an implied covenant of good faith and fair dealing.

74. Each agreement between Plaintiff and Defendant carries with it the implied covenant of good faith and fair dealing.

75. Plaintiff fulfilled all of her duties and obligations with respect to the Redemption Agreement.

76. Defendant has breached the implied covenant of good faith and fair dealing by engaging in the actions and inactions complained of herein.

77. As a direct and proximate result of Defendant's actions and inactions constituting a breach of the implied covenant of good faith and fair dealing, Plaintiff has been and will be damaged in an amount in excess of $75,000.

78. As a direct and proximate result of Defendant's actions and/or inactions constituting a breach of the implied covenant of good faith and fair dealing, Plaintiff has been required to retain the services of an attorney to prosecute this action and is therefore entitled to recover attorneys' fees and costs thereof.

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

1. For judgment in favor of Plaintiff for general damages in excess of $75,000 in an amount to be determined at trial;

2. For an award of its reasonable attorneys' fees as damages and/or pursuant to the terms and conditions of the Redemption Agreement and as allowed by law;

3. For an award of costs of suit incurred herein; and

4. For such other and further relief as this Court deems just and proper.

Dated: July 3, 2024                    HOWARD & HOWARD ATTORNEYS PLLC

By: /s/ Robert Rosenthal
Robert L. Rosenthal, Esq.
Mark J. Gardberg, Esq.
9465 Wilshire Blvd. Ste 300
Beverly Hills, CA 90212
*Attorneys for Plaintiff Gilda Versales*